Case: 1:23-cr-00245 Document #: 1 Filed: 04/22/23 Page 1 of 20 PageID #:1

AO 91 (Rev. 11/11) Criminal Complaint　　　　　　　　　　　　　　　　　　AUSA Michelle Parthum (312) 886-1317

FILED
4/22/2023
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CASE NUMBER: 23 CR 245 |
| v. | |
| JUAN SERNA, aka "Junior" | |

# CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

## Count One

On or about April 21, 2023, at Harvey, in the Northern District of Illinois, Eastern Division, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| Title 21, United States Code, Section 841(a)(1) | did knowingly and intentionally possess with intent to distribute 50 grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II Controlled Substance |

## Count Two

On or about April 21, 2023, at Harvey, in the Northern District of Illinois, Eastern Division, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| Title 18, United States Code, Section 922(g)(1) | knowing that he had previously been convicted of a crime punishable by a term of imprisonment exceeding one year, did knowingly possess, in and affecting interstate commerce, a firearm, namely, a .38 KelTec firearm, bearing serial number KGN14, which firearm had traveled in interstate and foreign commerce prior to defendant's possession of the firearm |

This criminal complaint is based upon these facts:

__X__ Continued on the attached sheet.

s/ Jason Jairala (with permission BWJ)<br>
JASON JAIRALA<br>
Task Force Officer, Drug Enforcement Administration (DEA)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: April 22, 2023

*Judge's signature*

City and state: Chicago, Illinois

BETH W. JANTZ, U.S. Magistrate Judge
*Printed name and title*

| UNITED STATES DISTRICT COURT | |
|---|---|
| NORTHERN DISTRICT OF ILLINOIS | |

## AFFIDAVIT

I, JASON JAIRALA, being duly sworn, state as follows:

### I. INTRODUCTION AND AFFIANT BACKGROUND

1. I am a Task Force Officer with the Drug Enforcement Administration ("DEA") and have been so employed for approximately one year. My current responsibilities include the investigation of narcotics-trafficking offenses. I am also a Police Officer with the Darien Police Department, where I have been employed for approximately five years.

2. This affidavit is submitted in support of a criminal complaint alleging that JUAN SERNA, aka "Junior," has violated Title 21, United States Code, Section 841(a)(1) (possession with intent to distribute methamphetamine) and Title 18, United States Code, Section 922(g)(1) (unlawful possession of a firearm by a felon).

3. The statements in this affidavit are based on my personal knowledge, and on information I have received from other law-enforcement personnel and from persons with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging SERNA with possession with intent to distribute methamphetamine and unlawful possession of a firearm by a felon, I have not included each and every fact known to me concerning this investigation. I have set

forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

4. This affidavit describes excerpts of written or recorded conversations, which I have summarized. These summaries do not necessarily refer to all of the topics covered during each conversation. In addition, these summaries do not include every conversation made by every speaker on the topic being described. Portions of the conversations that are quoted are preliminary transcriptions, which may be subject to modification upon further review. For some conversations, I have offered my understandings and/or interpretations of the conversation in brackets, which are based upon my experience and knowledge of the investigation to date, the content and context of the conversations, the experience of other investigators with whom I have consulted, and my professional training and experience as a law-enforcement officer.

## II. SUMMARY OF PROBABLE CAUSE

5. There is probable cause to believe that, on or about April 21, 2023, JUAN SERNA possessed methamphetamine with the intent to distribute and unlawfully possessed a firearm after having been convicted of a felony.

6. As specified in more detail below, on or about April 20 and 21, 2023, a confidential source working with the DEA participated in recorded telephone conversations with SERNA in which they agreed to meet at SERNA's residence on or about April 21, 2023, so that SERNA could sell the confidential source approximately four ounces of methamphetamine for approximately $850.

7. On or about April 21, 2023, shortly before the planned meeting to purchase the methamphetamine, law enforcement conducting surveillance on SERNA's residence attempted to take SERNA into custody after he entered the front passenger seat of a Dodge Ram that had arrived and parked at the scene. When officers attempted to take SERNA and the driver of the Dodge Ram ("Individual A") into custody, Individual A ignored law enforcement commands and reversed the vehicle, causing it to strike an unmarked police car with activated emergency lights that was parked behind the Ram.

8. During a protective pat-down search incident to SERNA's arrest, law enforcement recovered two clear plastic ziplock bags containing approximately 85.8 grams of a clear glass-like substance that field-tested positive for methamphetamine on SERNA's person, within his underwear and within his pants leg. Law enforcement also recovered an unloaded .38 KelTec firearm from SERNA's left rear pocket. During a later consensual search of SERNA's bedroom, law enforcement recovered a fully loaded MAC-10 .45 acp sub-machine gun, an additional magazine, and numerous rounds of .45 acp ammunition.

9. In addition, during SERNA's arrest, he spontaneously uttered that a blond, white female would be arriving in an Uber at 4:20 p.m., indicating that she would be bringing more methamphetamine. At approximately 4:20 p.m., a blond, white female did arrive in an Uber ("Individual B") carrying two bags. Individual B consented to a search of the bags, which were found to contain several clear plastic ziplock bags containing substances that field tested positive for approximately 382.4

gross grams of methamphetamine, approximately 79.4 gross grams of heroin, approximately 58.4 gross grams of cocaine base, approximately 66.2 gross grams of fentanyl, and approximately 33.9 gross grams of MDMA. During a *Mirandized* interview with law enforcement, Individual B stated that SERNA had asked her to get the narcotics and bring them to SERNA.

### III. STATEMENT OF PROBABLE CAUSE

#### A. BACKGROUND

10. On or about April 20, 2023, law enforcement officers with the Hickory Hills Police Department contacted investigating agents of the DEA and advised that they had a confidential source ("CS")[1] with information that an individual named JUAN SERNA, a/k/a "Junior," was involved in trafficking methamphetamine in the Chicago area. According to the Hickory Hills Police Department, the CS stated that s/he could purchase ounce-level quantities of methamphetamine from SERNA for approximately $350.

11. Investigating agents obtained SERNA's Illinois State Driver's License photograph from the Illinois Secretary of State. Agents showed the photograph to the CS, who confirmed that it depicted the individual s/he was referring to.

---

[1] The CS has 16 known prior felony convictions for offenses including larceny, fraudulent activity, stolen vehicle, and dangerous drugs. The CS was registered by the Hickory Hills Police Department as an informant on or about April 20, 2023. The CS is cooperating with law enforcement in the hope of charging consideration for a narcotics-related arrest that occurred on or about April 20, 2023. The CS has not been promised anything for his/her cooperation with law enforcement. Based on my participation in this investigation, I deem the information provided by the CS to be credible because it has been corroborated by several pieces of evidence including the recorded phone calls with SERNA, SERNA's presence at the agreed-upon meeting location, and law enforcement's discovery of methamphetamine on SERNA's person, as described in more detail below.

12. Investigating agents performed a criminal history query through law enforcement databases on SERNA and learned that he has a valid arrest warrant through the Illinois Department of Corrections ("IDOC") for a parole violation related to an alleged escape from electronic monitoring stemming from a conviction for attempted felony possession of a firearm by a parolee in Cook County Case number 21CR0075601.

B. **PLANNED OPERATION AND INITIATION OF SURVEILLANCE**

13. At the direction of DEA investigating agents, the CS placed several telephone calls to SERNA at the telephone number the CS had previously saved for SERNA (708-XXX-5070)[2] in order to coordinate a future narcotics transaction. The telephone calls were recorded by an investigating officer who was present with the CS during the calls.

14. On or about April 20, 2023, at approximately 4:31 p.m., the CS spoke with SERNA on a recorded call in the presence of law enforcement about meeting to purchase approximately four ounces of methamphetamine for approximately $850. The following is a rough transcription of portions of their recorded conversation:

| CS: | . . . [H]ow much for four [ounces of methamphetamine] can you do? / Can you do less? [*i.e.*, Would you sell it to me for a lower price than the price you just stated?] / Is it |

---

[2] According to IDOC records, the phone number 708-XXX-5070 is listed as SERNA's phone number for the timeframe between on or about September 24, 2022 and the present. Accordingly, I reasonably believe that SERNA is the user of the phone number 708-XXX-5070, and that statements in this affidavit bearing SERNA's name are reasonably attributed to him as the speaker.

5

|  |  |
|---|---|
|  | good? Are they chunks?[3] / [A]h sh*t, I gotta get the . . . I don't have all the money. I'll have it for sure by 7:30.[4] |
| . . . |  |
| SERNA: | I'll give you like two [ounces of methamphetamine], I'll give half of the four [ounces of methamphetamine] . . . [*i.e.*, If you don't have all the money now, I'll sell you half of the 4 ounces you want to buy] |
| CS: | Um that's fine then, what time then? You wanna do it now? |
| SERNA: | Wait wait [unintelligible] |
| CS: | I'd rather wait because I'd rather have the whole thing. |
| SERNA: | So can you meet me by seven? |
| CS: | 7:30? Cause my guy, see I'm waiting for my guy to get off the work to give me the rest of the money [for the methamphetamine]. |
| SERNA: | Well I'll bring all of them and if you have paper [*i.e.*, money], otherwise you can give me 250 [dollars] more when when you get it from your guy or whatever [*i.e.*, I'll bring all 4 ounces of methamphetamine, and if you have enough money you can buy it all, and if you don't, you can have what you pay for and buy the remainder once you have more money]. |

---

[3] Based on my training and experience, I am aware that methamphetamine broken into "chunks" is more desirable than methamphetamine that is crumbled into smaller rocks/grains.

[4] This portion of the call was not on speakerphone, and so SERNA's side of the conversation was not recorded. The call was then placed on speakerphone and SERNA's side of the conversation was recorded beginning with the excerpt quoted in text near the top of page 6, *infra* ("I'll give you like two . . .").

6

15. On or about the same date at approximately 5:15 p.m., the CS again spoke with SERNA on a recorded call in the presence of law enforcement. The following is a rough transcription of portions of their recorded conversation:

| | |
|---|---|
| SERNA: | [C]an you meet in an hour? . . . |
| . . . | |
| SERNA: | Hopefully you'll have the 850 [dollars] ready [to purchase all 4 ounces of methamphetamine]. |
| CS: | I got it, I don't have the 850 yet, by 7 I will. |

16. On or about the same date at approximately 7:14 p.m., the CS again spoke with SERNA on a recorded call in the presence of law enforcement. SERNA told the CS that he was occupied assisting his ex-girlfriend with car trouble. SERNA suggested that the CS meet SERNA at his home ("my crib") in Harvey, Illinois, texting the address to the CS at approximately 7:15 p.m. (which text the CS provided to law enforcement). During recorded calls at approximately 7:16 p.m. and 9:02 p.m., the CS stated that SERNA's residence was too far away for the CS to travel to that evening, and during the 9:02 p.m. call, SERNA and the CS agreed to meet for the transaction the following day (on or about April 21, 2023) instead. The CS stated, "If we can do it tomorrow," and SERNA responded, "Yes we can do this tomorrow."

17. On or about April 21, 2023, law enforcement established surveillance at the Harvey, Illinois address that SERNA had given to the CS (the "Subject Premises"). I am aware from my participation in the surveillance of the Subject Premises and the later search of SERNA's apartment residence inside the premises that the Subject Premises is a single-family residence that is divided into three

7

separate dwelling units, one in the basement, one on the ground floor, and one in a second level/attic.

18. At approximately 12:41 p.m., law enforcement observed a black Dodge Dart bearing Illinois registration XXX4648 arrive and park in front of the Subject Premises. Law enforcement observed a subject who was positively identified as SERNA (based on law enforcement's preexisting familiarity with SERNA's Illinois State Driver's License photograph) exit the vehicle from the front-passenger area wearing a black backpack and walk toward the Subject Premises near a gangway on the south side of the premises.

19. At approximately 12:54 p.m., the CS spoke with SERNA on a recorded telephone call in the presence of law enforcement. The following is a rough transcription of portions of their recorded conversation:

| | |
|---|---|
| SERNA: | [Unintelligible] but I'm gonna get more [methamphetamine] |
| CS: | Anything right now because my guy's waiting on me. Really, I need four [ounces of methamphetamine]. |
| SERNA: | You need four? You got the money for the four? |
| CS: | I got the whole thing [*i.e.*, all of the money needed to purchase 4 ounces of methamphetamine] now. |
| SERNA: | You don't got a ride over here [to the Subject Premises] do you? |
| CS: | No not yet, let me call around looking for a ride real quick. |

8

20. During a recorded call in the presence of law enforcement at approximately 1:03 p.m., the CS said, "my ride wants to know where he's gotta go," and SERNA responded, "That address I gave you," and then restated the address of the Subject Premises.

21. At approximately 1:34 p.m., the CS spoke with SERNA on a recorded telephone call in the presence of law enforcement. The following is a rough transcription of portions of their recorded conversation:

| | |
|---|---|
| CS: | Yo, we're on our way but um, but my driver, is there like a gas station by you? |
| SERNA: | You don't want to come to my house? |
| CS: | No, no, it's cause he's like kinda paranoid, he's like |
| SERNA: | I was gonna tell you to take your time, cause I got two [ounces of methamphetamine] almost two of them, but um it's on its way. It's gonna be here in like half an hour, 25 minutes [*i.e.*, SERNA only had 2 ounces of methamphetamine available, not all 4 the CS wanted to purchase, but SERNA expected that more methamphetamine would be delivered within half an hour]. |

22. At approximately 1:56 p.m., law enforcement officers surveilling the Subject Premises observed a gray Dodge Ram pickup truck bearing Indiana Registration XXX6864 arrive at the premises and then pull around to the back of the premises and park. The driver of the vehicle, a Hispanic male wearing a baseball hat, a maroon shirt, and brown pants ("Individual A"), was observed exiting the vehicle and then entering the Subject Premises.

23. At approximately 2:33 p.m., the CS spoke with SERNA on a recorded telephone call in the presence of law enforcement. The following is a rough transcription of portions of their recorded conversation:

| | |
|---|---|
| CS: | Yo, I'm about to pull up. |
| SERNA: | Ey um, they're gonna be here at like 20 minutes at the most [referring to SERNA's narcotics courier] |
| CS: | What the hell |
| SERNA: | But yeah, I got a couple here [*i.e.*, I have a couple ounces of methamphetamine with me at the Subject Premises already] |

24. During a recorded call in the presence of law enforcement at approximately 2:42 p.m., the CS stated that s/he was going to stop for food before meeting SERNA. The CS stated, "I'm gonna grab something to eat real quick . . . ok so when your sh*t comes [*i.e.*, the methamphetamine delivery], let me know right away. Let me know right away so we can meet up an sh*t." SERNA responded, "Ok so it's on the way already [*i.e.*, SERNA's narcotics courier was on the way to the Subject Premises]."

25. At approximately 3:09 p.m., SERNA texted the CS, "They [*i.e.*, the courier delivering the methamphetamine] in an Uber coming this way said the Uber says 3:40."

C. **ARREST OF SERNA AND SEIZURE OF FIREARM AND NARCOTICS**

26. At approximately 3:29 p.m., law enforcement surveilling the Subject Premises observed SERNA and Individual A exit from the premises. At approximately 3:30 p.m., law enforcement observed Individual A drive the gray

Dodge Ram pickup truck from the rear to the front of the premises. Law enforcement then observed SERNA walk toward the Dodge Ram and enter the front passenger seat of the vehicle.

27. Based upon the above observations and SERNA's active IDOC warrant (*see* paragraph 12, *supra*), law enforcement then attempted to take SERNA into custody. Law enforcement officers wearing vests clearly marked "POLICE" approached the vehicle—which was occupied by Individual A in the driver's seat and SERNA in the front passenger seat—on foot. Law enforcement identified themselves as DEA agents and commanded the subjects not to move. An unmarked police vehicle which had its emergency lights activated simultaneously parked behind the Dodge Ram.

28. At that moment, Individual A abruptly began driving the Dodge Ram in reverse, striking the police vehicle parked behind it.

29. Law enforcement officers then apprehended SERNA and Individual A.

30. Law enforcement officers conducted a protective pat-down search of SERNA incident to his arrest. Officers recovered: (1) a clear plastic ziplock bag containing a clear glass-like substance suspected to be methamphetamine from within SERNA's underwear near his groin area; (2) a second clear plastic ziplock bag containing a clear glass-like substance suspected to be methamphetamine from the area of SERNA's right ankle, which I suspect had also been concealed within SERNA's underwear before falling out during the protective pat-down, because the bag was loose and unsecured within SERNA's pant leg in a manner that would have

11

made it difficult to walk; (3) an unloaded black .38 KelTec firearm bearing serial number KGN14 from SERNA's left rear pocket; and (4) two bags of unidentified pills from a cargo pocket on SERNA's lower right leg.

31. Law enforcement officers also conducted a protective pat-down of Individual A incident to his/her arrest. Officers recovered a clear plastic ziplock bag containing a clear glass-like substance suspected to be methamphetamine from Individual A's front left pocket. The packaging and substance contained therein were very similar in appearance to the suspected methamphetamine recovered from SERNA's person.

32. The suspected methamphetamine recovered from the persons of SERNA and Individual A all field-tested positive for methamphetamine. The two quantities recovered from SERNA had a gross weight of approximately 85.8 grams. The quantity recovered from Individual A had a gross weight of approximately 33.3 grams.

    **D.    SERNA'S POST-ARREST STATEMENTS AND ARRIVAL OF INDIVIDUAL B**

33. After his arrest, investigative agents heard SERNA spontaneously utter words to the effect of or indicating that a blond, white female would be arriving at the Subject Premises in an Uber around 4:20 p.m. with more methamphetamine. SERNA and Individual A were then transported to a local police department for further investigation.

34. Then, at approximately 4:20 p.m., law enforcement observed a vehicle arrive near the front of the Subject Premises. The vehicle was displaying an Uber

medallion in its front windshield. Law enforcement observed a blond, white female subject ("Individual B") exit from the rear of the vehicle carrying two bags. Law enforcement approached Individual B and provided her with *Miranda* warnings, and Individual B agreed to speak with law enforcement.

35. Investigating agents asked Individual B whether there was anything illegal in her bags, and Individual B stated, "Yes." Agents requested permission to search Individual B's bags, and she consented.

36. Agents opened and searched the bags Individual B had been carrying. Inside one of the bags, agents located and recovered several clear plastic ziplock bags which contained substances which field tested positive for approximately 382.4 gross grams of methamphetamine, approximately 79.4 gross grams of heroin, approximately 58.4 gross grams of cocaine base, approximately 66.2 gross grams of fentanyl, and approximately 33.9 gross grams of MDMA. Agents also located and recovered packaging materials and other miscellaneous paraphernalia from within the bag.

37. Individual B told law enforcement officers that "Junior" (a known nickname for SERNA, *see* paragraph 10, *supra*) had asked her to bring the narcotics to the Subject Premises.

38. Individual B was then transported to a local police department for further investigation.

### E. CONSENSUAL SEARCH OF SERNA'S HOME RECOVERS ADDITIONAL FIREARM

39. At approximately 5:10 p.m., law enforcement officers that remained at the Subject Premises observed an individual ("Individual C") who identified him/herself as the resident of the ground-floor unit of the Subject Premises. Law enforcement officers showed Individual C the Illinois State Driver's License photograph of SERNA and asked Individual C whether s/he recognized the individual depicted in the photograph. Individual C stated that the person shown was his/her upstairs neighbor.

40. At approximately 5:42 p.m., SERNA provided verbal consent to law enforcement to search his residence. While SERNA initially claimed that he did not live at the Subject Premises, SERNA later said words to the effect that he wanted to help himself and that he was willing to allow law enforcement to search his apartment, but that whatever was inside of it was not his. SERNA then provided law enforcement with the key to access the attic-level apartment in the Subject Premises.

41. Law enforcement used the key SERNA had provided to access the attic-level apartment. Law enforcement entered the bedroom to the right of the staircase (which Individual B later identified as SERNA's bedroom, *see infra*). Law enforcement searched the bedroom and recovered indicia of SERNA's occupancy of the bedroom, including a medical bill with the name JUAN SERNA on it. Law enforcement also recovered the following items: (1) a fully loaded MAC-10 .45 acp sub-machine gun with no discernable serial number from within a pillowcase on the bed; (2) an additional magazine and numerous rounds of .45 acp ammunition

14

recovered from a black backpack that appeared similar to the backpack SERNA had been identified wearing when he entered the Subject Premises earlier that afternoon (*see* paragraph 18, *supra*); (3) approximately 20 patches of suspected fentanyl recovered from a safe that was hidden within a false book, identified as fentanyl based on labels identifying each patch as containing "2.55 mg Fentanyl," for a combined gross weight of approximately 195.8 grams; and (4) various unidentified pills.

### F. POST-ARREST STATEMENTS OF INDIVIDUALS A AND B

42. During a post-arrest, *Mirandized* interview at a local police department, Individual A stated that s/he had been at the Subject Premises that day in his/her capacity as a handyperson to drop off two doors for SERNA. Individual A stated that SERNA paid him/her for the work and materials (which Individual A believed to be worth approximately $50) with the methamphetamine that law enforcement recovered from Individual A's person. Individual A also stated that s/he and SERNA had smoked methamphetamine together inside the Subject Premises that day.[5]

43. During a post-arrest, *Mirandized* interview at a local police department, Individual B[6] stated that "Junior" had asked her to get the narcotics and bring them

---

[5] Individual A has no known felony convictions. Individual A has not been promised anything for his/her cooperation with law enforcement. Based on my participation in this investigation, I deem the information provided by Individual A to be credible, because it has been corroborated by agents' surveillance and the similarity in appearance and packaging of the suspected methamphetamine recovered from both SERNA and Individual A incident to their arrests.

[6] Individual B two known felony convictions for stolen vehicle offenses. Individual B has not been promised anything for her cooperation with law enforcement. Based on my participation in this investigation, I deem the information provided by Individual B to be credible, because it has been corroborated by several pieces of evidence including the recorded phone calls and text messages between the CS and SERNA, Individual B's arrival at the Subject Premises in the manner and at the time predicted in those communications, the consistency between

15

to him. When asked, Individual B stated that "Junior's" real name is JUAN SERNA. Individual B stated that SERNA was living in the upstairs apartment of the Subject Premises, and that his bedroom was located to the right of the staircase. Individual B also said that, a few days previously, she had been inside the attic-level apartment of the Subject Premises with SERNA when she tripped on an item that appeared to be a firearm and asked SERNA what it was, and that SERNA responded that it was a MAC-10. Individual B also said that on the same occasion, SERNA had shown her a fentanyl patch.

### G. SERNA'S CRIMINAL HISTORY

44. Based on a preliminary search of SERNA's criminal history through IDOC, I know that SERNA has the following felony convictions:

    a. On or about September 23, 2013, possession of between 15 and 100 grams methamphetamine, in the Circuit Court of Cook County, Illinois, case number 13C66127501, for which he was sentenced to 6 years in prison;

    b. On or about September 17, 2016, possession of between 15 and 100 grams methamphetamine, in the Circuit Court of Cook County, Illinois, case number 16CR1840201, for which he was sentenced to 8 years in prison;

    c. On or about September 22, 2022, attempted felony possession of a firearm by a parolee, in the Circuit Court of Cook County, Illinois, case number

---

SERNA's description of Individual B's appearance and her actual appearance as observed by investigating officers, and the narcotics recovered inside the bag Individual B was carrying.

21CR0075601, for which he was sentenced to 2 years and 6 months in prison, and for which he was on parole at the time of the conduct described in this Affidavit.

    **H.**    **INTERSTATE NEXUS**

45. On or about April 22, 2023, I spoke to Group Supervisor ("GS") Kevin Srivastava of the Bureau of Alcohol, Tobacco, and Firearms, who told me the following:

    a. GS Srivastava is a certified interstate nexus expert for firearms and ammunition.

    b. GS Srivastava was informed of the make of the firearm seized from SERNA's left rear pocket.

    c. Based upon his training and experience and the research he conducted, GS Srivastava determined that the .38 KelTec firearm was not manufactured in the State of Illinois. It is the opinion of GS Srivastava that if the above firearm was received and/or possessed in the State of Illinois, it traveled in or affected interstate and/or foreign commerce.

**IV.**    **CONCLUSION**

46. Based on the above information, I submit that there is probable cause to believe that on or about April 21, 2023, SERNA possessed methamphetamine with the intent to distribute, and unlawfully possessed a firearm after having been convicted of a felony. I therefore respectfully request that this Court issue a criminal complaint and arrest warrant charging SERNA with violations of Title 21, United

States Code, Section 841(a)(1) (Count One), and Title 18, United States Code, Section 922(g)(1) (Count Two).

                                            FURTHER AFFIANT SAYETH NOT.

s/ Jason Jairala (with permission BWJ)
JASON JAIRALA
Task Force Officer, Drug Enforcement Administration

SWORN TO AND AFFIRMED by telephone on April 22, 2023.

_____
Honorable BETH W. JANTZ
United States Magistrate Judge

18