IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | 23-CR-245 |
| v. | ) | |
| | ) | Judge Martha M. Pacold |
| JUAN SERNA | ) | |

## JUAN SERNA'S MOTION TO DISMISS

Juan Serna, by the Federal Defender Program and its attorney, Seema Ahmad, moves pursuant to Rule 12(b)(1) of the Federal Rules of Criminal Procedure to dismiss Counts Two and Three of the indictment filed against him either facially or as-applied. Dkt. No. 19. Count Two alleges that Mr. Serna possessed a firearm having previously been convicted of a felony, in violation of 18 U.S.C. §922(g)(1). *Id.* Count Three alleges that Mr. Serna possessed a firearm in furtherance of a drug trafficking offense, in violation of 18 U.S.C. §924(c)(1)(A). *Id.*

The Supreme Court's "text and tradition" approach to the Second Amendment, outlined and explained in *Atkinson v. Garland*, No. 22-1557, 2023 WL 4071542 (7th Cir. June 20, 2023), *Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 103 (3d Cir. 2023) (*en banc*), and *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), compels the conclusion that

§§922(g)(1) and 924(c)(1)(A) are unconstitutional as applied to Mr. Serna and the Court should dismiss those counts with prejudice.[1]

## PROCEDURAL BACKGROUND

On April 22, 2023, the government filed a complaint against Mr. Serna alleging firearms charges in connection with drug trafficking. Complaint, Dkt. No. 1. More specifically, the government alleges that on or about April 21, 2023, a confidential informant engaged in conversations with Mr. Serna where they agreed to meet in order for Mr. Serna to sell the informant four ounces of methamphetamine for $850. *Id.* at 2. Before the completed deal, Mr. Serna was taken into custody. *Id.* at 3. The government claims to have seized drugs off of Mr. Serna's person as well as an unloaded firearm. *Id.* After a contested preliminary hearing, the government obtained an indictment in this case. Dkt. No. 19. As to Mr. Serna, the charges are as follows:

Count 1: Possession with intent to distribute; 21 U.S.C. 841

Count 2: Felon-in-possession of a firearm; 18 U.S.C. 922(g)

Count 3: Carrying a firearm during drug trafficking; 18 U.S.C. 924(c)

---

[1] "Federal Rule of Criminal Procedure 12(b)(1) permits pretrial motions raising 'any defense' that can be adjudicated without a trial." *United States v. Stelmachowski*, No. 15 CR 339-1, 2018 WL 828078, at *6 (N.D. Ill. Feb. 12, 2018) (St. Eve, J.). Because of that, a defendant's facial and as-applied constitutional challenge to an indictment is properly raised as a motion to dismiss under Rule 12(b)(1). *Id.*

Count 4: Distribution of a controlled substance; 21 U.S.C. 841

Count 5: Conspiracy to possess with intent to distribute; 21 U.S.C. 846

    *Id.*

    On June 7, 2023, the Third Circuit became the first federal appellate court to hold 18 U.S.C. § 922(g)(1) unconstitutional in an as-applied challenge. *See Range*, 69 F.4th 96. In a thorough en banc decision, the *Range* opinion interpreted the Supreme Court's recent decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). Subsequently, on June 20, 2023, the Seventh Circuit issued its opinion in *Atkinson v. Garland*, No. 22-1557, where it held that the government's historical analysis of the constitutionality of Section 922(g)(1) fell "well short of *Bruen*'s demands." Because *Atkinson*'s decision under review and briefing on appeal pre-dated *Bruen*, the Seventh Circuit remanded the case to allow the government to attempt to provide more persuasive historical evidence, although the government had rejected an invitation for remand at oral argument after *Bruen*. Nonetheless, *Atkinson* was clear that the record before it was insufficient to "affirmatively prov[e] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." 70 F.4th 1020 (quoting *Bruen*, 142 S. Ct. at 2127).[2] As a result of

---

[2] The Eighth Circuit has come to the opposite conclusion of the en banc *Range* court and found the government's historical evidence to be sufficient to support the constitutionality

these developments, Mr. Serna moves to dismiss Counts Two and Three of the indictment.

## ARGUMENT

## I.    INTRODUCTION AND THE NEW *BRUEN* STANDARD

Our nation's history, and recent appellate and Supreme Court authority, make clear that § 922(g)(1) is unconstitutional facially and as applied to Mr. Serna. He is part of "the people" entitled to "possess and carry weapons" for self-defense, *District of Columbia v. Heller*, 554 U.S. 570, 592 (2010), regardless of any prior criminal history. And the government has not and will not be able to show any historical tradition divesting him of his Second Amendment rights. *See United States v. Prince*, No. 22-CR-240, Dkt. No. 73 at 21 (Gettleman, J.) ("Because this court determines that defendant is a member of 'the people' protected by the Second Amendment, and because neither type of historical regulation offered by the government satisfies its burden to show a history and tradition of 'relevantly similar' analogues to § 922(g)(1)'s permanent, categorical firearm dispossession of all felons, the court is forced to grant

---

of Section 922(g). *United States v. Jackson*, 69 F.4th 495, 505 (8th Cir. 2023). But while Judge Wood's dissent in *Atkinson* would have followed the Eighth Circuit's lead, the *Atkinson* majority refused to do so. *See ante* at 17.

defendant's motion to dismiss the indictment against him under *Bruen*, regardless of whether he is challenging the statute as applied or on its face.").

Prior to *New York State Rifle & Pistol Ass'n v. Bruen*, a majority of appellate courts, including the Seventh Circuit, applied an intermediate, means-end scrutiny framework to the scope of the Second Amendment alongside a historical inquiry. *See, e.g., Kanter v. Barr*, 919 F.3d 437, 441 (7th Cir. 2019). But in *Bruen*, the Supreme Court explicitly abrogated this framework as "one step too many." *Bruen,* 142 S. Ct. at 2127 (rejecting the two-step test set out in *Kanter*). In its place, *Bruen* explained that

> the standard for applying the Second Amendment is as follows:
> When the Second Amendment's plain text covers an individual's
> conduct, the Constitution presumptively protects that conduct.
> The government must then justify its regulation by demonstrating
> that it is consistent with the Nation's historical tradition of firearm
> regulation. Only then may a court conclude that the individual's
> conduct falls outside the Second Amendment's "unqualified
> command."

*Id.* at 2129–30 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 51 n.10 (1961)). The Seventh Circuit recently acknowledged *Bruen*'s abrogation of *Kanter* in *Atkinson*, underscoring that now the government may only defend the constitutionality of a gun regulation "by proving that it is 'consistent with this Nation's historical tradition of firearm regulation.'" *Atkinson,* 70 F.4th at 1020 (citing *Bruen*, 142 S.Ct. at 2126).

Here, Mr. Serna' conduct—the possession of a firearm—is covered by the plain text of the Second Amendment and is presumptively protected by the Constitution. He is part of "the people" who are protected. The burden is therefore on the government to "*affirmatively prove* that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen,* 142 S.Ct. at 2127 (emphasis added). It cannot. In fact, the historical record from the time of the founding demonstrates the exact opposite: that felons who completed their punishments were allowed to possess firearms just like any other member of the community. *See* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 283–285 (2020) (collecting examples of this). Laws prohibiting felons from bearing arms did not begin to appear until the twentieth century. *See* C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 708 (2009) ("Though recognizing the hazard of trying to prove a negative, one can with a good degree of confidence say that bans on convicts possessing firearms were unknown before World War I."). As described below, this analysis extends to the mere possession of a

firearm while engaging in illegal activity. The charges against Mr. Serna are therefore unconstitutional.

## II. MR. SERNA IS AMONG "THE PEOPLE" COVERED BY THE SECOND AMENDMENT'S PLAIN TEXT.

The Second Amendment protects "the right of the people to keep and bear arms[.]" U.S. Const. amend. II. As the Supreme Court has explained, this plain language "guarantee[s] the individual right to possess and carry weapons[.]" *D.C. v. Heller*, 554 U.S. 570, 592 (2008). Caselaw and historical authority concretely show that individuals with prior felony convictions are part of "the people" protected by the Second Amendment.

The term "the people," as used in the Second Amendment, "unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580. It is a term of art that appears not just in the Second Amendment, but in the First, Fourth, Ninth, and Tenth Amendments as well. *Id.* at 579. The repeated use of this term reflected a consistent meaning—namely, that these instances "unambiguously refer to individual rights, not 'collective' rights, or rights that may be exercised only through participation in some corporate body." *Id.* Based on this, *Heller* held that the language of the clause creates "a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.* at 581. Just as Mr. Serna retains his right to petition the government or be

protected from unlawful searches and seizures, so too does he retain his Second Amendment rights.

Although *Heller* included dicta suggesting the Second Amendment's protection was for "law-abiding, responsible citizens," *id.* at 635, the Seventh Circuit has twice now rejected the argument that this dicta limits the Second Amendment's application. In *United States v. Meza-Rodriguez*, the Seventh Circuit held that:

> While some of *Heller*'s language does link Second Amendment rights with the notions of "law-abiding citizens" and "members of the political community," *see Heller,* 554 U.S. at 580, 625, 128 S.Ct. 2783, those passages did not reflect an attempt to define the term "people." We are reluctant to place more weight on these passing references than the Court itself did.

*United States v. Meza-Rodriguez*, 798 F.3d 664, 669 (7th Cir. 2015). Instead— following the core, actual holding of the *Heller* decision—the Seventh Circuit concluded that "the term 'the people' in the Second Amendment has the same meaning as it carries in other parts of the Bill of Rights[.]" *Id.* at 670.

Like *Heller*, *Bruen* contains similar dicta. And, like *Meza-Rodriguez*, the Seventh Circuit rejected this renewed reliance on that dicta in *Atkinson.* 70 F.4th at 1022 (rejecting the government's reliance on this "oft-quoted dicta" and holding that "[n]othing allows us to sidestep *Bruen*" and avoid the historical inquiry). Rather than purporting to limit the scope of "the people" protected by the Second Amendment, *Bruen* reiterated *Heller*'s holding that

8

"[t]he Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions." *Bruen*, 142 S. Ct. at 2156 (quoting *Heller*, 554 U.S. at 581).

The Third Circuit reached the same conclusion in its recent *en banc* opinion in *Range*. 69 F.4th at 101-103. The Third Circuit cited four well-founded reasons why the "law-abiding" language from these opinions does not support the notion that a felony conviction places one outside the "people" covered by the Second Amendment. First, the criminal histories of the plaintiffs in *Heller*, *McDonald v. Chicago*, 561 U.S. 742, 780 (2010), and *Bruen* were not at issue. *Id*. at 101. Second, the court noted that *Heller* examined the definition of "the people" across constitutional amendments. "Unless the meaning of the phrase 'the people' varies from provision to provision—and the Supreme Court in *Heller* suggested it does not—to conclude that Range is not among 'the people' for Second Amendment purposes would exclude him from those rights as well." *Id*. at 102. The *Range* court saw "no reason to adopt an inconsistent reading of 'the people" between these different amendments. *Id*.

Third, the *Range* court cited with approval then-Judge Barrett's reasoning in her dissent in *Kanter*, 919 F.3d at 452, where she "persuasively explained that 'all people have the right to keep and bear arms,' though the legislature may constitutionally 'strip certain groups of that right.'" *Id* at 102. Similarly, the Third Circuit reaffirmed its own prior precedent explaining that

9

the right area for the inquiry of a felon's rights is the scope of the Second Amendment's protections, not whether a felon is of "the people" covered in the first instance. *Id.* (citing *Binderup v. Att'y Gen. United States of Am.*, 836 F.3d 336, 344 (3d Cir. 2016)); *see also United States v. Rahimi*, 61 F.4th 443, 451-52 (5th Cir. 2023).

Finally, the *Range* court pointed to the expansiveness of the use of the phrase "law-abiding," reasoning that the Supreme Court could not possibly have meant—in a case that did not present the question—that any individual who ever ran afoul of any law, however minor and in any circumstance, could be excluded from the protections of the Second Amendment altogether. *Range*, 69 F.4th at 102. "[R]esponsible" was likewise susceptible to far too many different interpretations. *Id.* The Fifth Circuit has reached the same conclusion. *Rahimi*, 61 F.4th at 453 ("Under the Government's reading, Congress could remove 'unordinary' or 'irresponsible' or 'non-law-abiding' people—however expediently defined—from the scope of the Second Amendment. Could speeders be stripped of their right to keep and bear arms? One easily gets the point[.]").

Ultimately, this understanding of dicta as cabining the scope of "the people" covered by the Second Amendment is far too narrow. Such a reading would improperly delegate to the legislature the entirety of who receives the protection of the Second Amendment. That is no protection of the right at all,

and flatly inconsistent with *Bruen*'s reasoning. Rather, consistent with *Meza-Rodriguez*, *Atkinson*, and *Range*, the Second Amendment extends to individuals with prior felony records, including Mr. Serna.

### III. THE GOVERNMENT CANNOT MEET ITS BURDEN TO ESTABLISH § 922(G)(1) IS CONSISTENT WITH HISTORICAL TRADITION.

As the plain text of the Second Amendment covers the simple possession by a felon criminalized by Section 922(g)(1), the burden shifts to the government to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130; *Atkinson*, 70 F.4th at 1022. The government cannot meet that burden. The Third Circuit has held as much in *Range*, and the Seventh Circuit has already expressed deep skepticism in *Atkinson*.[3] For good reason: the historical record demonstrates that there is no historical tradition of preventing felons from bearing arms, only a distinctly modern one.

### A. BRUEN REQUIRES A NARROW HISTORICAL ANALYSIS AND A SHOWING OF A "DISTINCTLY SIMILAR" FOUNDING ANALOGUE.

The *Bruen* inquiry asks "whether 'historical precedent' from before, during, and even after the Founding evinces a comparable tradition of regulation." 142 S. Ct. at 2129. Yet "not all history is created equal." *Id.* at

---

[3] Even before *Bruen*, the Seventh Circuit found the historical record to be inconclusive at best. *Kanter*, 919 F.3d at 445–448.

11

2131–32. Because "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*," Founding evidence is most important. *Id.* at 2136 (quotations omitted) (emphasis in original). By contrast, earlier historical evidence "may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years." *Id.* Similarly, post-ratification laws that "are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* at 2137 (quotations and emphasis omitted). The government bears the burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127.

*Bruen* explains how to evaluate whether an appropriate condition exists, delineating two types of possible firearm regulations. The first type "addresses a general societal problem that has persisted since the 18th century." *Id.* at 2131. For this first type, the historical inquiry "will be relatively straightforward." *Id.* Courts should determine whether "a distinctly similar historical regulation address[ed] the problem." *Id.* If earlier generations did not regulate the problem, or if they regulated it "through materially different means," then the challenged regulation violates the Second Amendment. *Id.* Likewise, if earlier generations considered but then

12

rejected comparable regulations as unconstitutional, "that rejection surely would provide some probative evidence of unconstitutionality." *Id.*

The second type of possible firearm regulation concerns "unprecedented societal concerns," "dramatic technological changes," or problems "unimaginable at the founding." *Id.* at 2132. These are evaluated with "reasoning by analogy." *Id.* For these sorts of regulations, courts should determine whether the challenged regulation is "relevantly similar" to an earlier one, with special attention to "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132–33.

*Bruen*'s own analysis is illustrative. There, the Court determined that New York's general bar on concealed-carry was designed to address a general societal problem: "handgun violence, primarily in urban areas." *Id.* at 2131 (cleaned up). And so, for New York's restriction to pass constitutional muster, the state had to "demonstrate a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense." *Id.* at 2138. But the state failed to identify such a tradition, having identified at most historical restrictions on some "dangerous and unusual weapons" and "bearing arms to terrorize the people." *Id.* at 2143. Without on-point historical examples of public-carry limitations, the Court concluded, "no historical basis" contradicted

13

"an otherwise enduring American tradition permitting public carry." *Id*. at 2145, 2154.

**B. THERE IS NO HISTORICAL TRADITION OF PROHIBITING FELONS FROM POSSESSING FIREARMS.**

Crucially, *Bruen* has already answered one important question: regulations of firearms like these are questions of general social problems, *not* new ones. The government must therefore show a "distinctly similar" historical regulation to uphold its restriction. 142 S.Ct. at 2131.

This burden is significant. In its very recent *Atkinson* decision, for example, the Seventh Circuit confronted a record and briefing developed before the *Bruen* opinion was issued. In deciding to remand to the district court for further briefing, the Seventh Circuit acknowledged that "the government's brief before us includes some historical analysis," but stated that the record was "nothing close to what would satisfy the demanding standard set forth in *Bruen*" and "falls well short of *Bruen*'s demands." *Atkinson*, 70 F.4th at 1022. The government had provided the court with "some Founding era commentary," and explained that "that felons … were historically subject to execution and estate forfeiture, as well as the loss of other civic rights." *Id*. *Atkinson* held that this was insufficient and "[fell] well short of *Bruen's* demands." *Id*. The burden is on the government to make an even more substantial showing before this court.

14

The government will be unable to do so. Mr. Serna briefly notes, the burden notwithstanding, that this lack of felon disarmament is uniform across several different historical periods. In the early American republic, the most significant period, there were no laws that prohibited ex-felons from possessing firearms after they had completed their punishment. *See, e.g.*, Conrad Kahn, *Challenging the Federal Prohibition on Gun Possession by Nonviolent Felons*, 55 S. Tex. L. Rev. 113, 127 (2013) ("the federal felon-firearm prohibition only dates back to 1938, and nonviolent felons were not prevented from possessing firearms until the enactment of the 1968 [Gun Control Act]"); Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551, 1563 (2009). Two prescient dissents from the pre-*Bruen* era—both of which predicted *Bruen* and exhaustively canvassed the historical record—firmly demonstrate that felon-in-possession laws have no historical support. *See Kanter*, 919 F.3d at 454 (Barrett, J., dissenting) ("at least thus far, scholars have not been able to identify any such laws" barring felons from possessing firearms); *Folajtar v. Att'y Gen. of the United States*, 980 F.3d 897, 915 (3d Cir. 2020) (Bibas, J., dissenting) ("I cannot find, and the majority does not cite, any case or statute from that era that imposed or authorized such bans."). And there were some limited other dispossession efforts, such as of Catholics or Loyalists, but these efforts were for distinct purposes and nonetheless carved out exceptions for self-defense. Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep*

15

*Arms in Early America: The Legal Context of the Second Amendment,* 25 Law
& Hist. Rev. 139, 157 (2007).

Pre-Founding England, too, had no such laws. Rather, it restricted only
certain individual's rights to carry in certain manners, such as "going armed
to terrify the King's subjects," *Bruen*, 142 S.Ct. at 2141, with an "intent to
cause terror in others." *Id.* at 2183 (Breyer, J., dissenting). There were also
surety laws, requiring a kind of bond to be posted before going armed but only
after an individualized, non-criminal determination. Marshall, 32 Harv. J.L.
& Pub. Pol'y at 717 (quoting 5 William Blackstone, *Commentaries* \*386–87 (St.
George Tucker ed., 1803) (1767)); *see also Rahimi*, 61 F.4th at 459–60
(discussing how sureties worked). But these laws targeted those found, via a
specific and particularized finding by the justice of the peace, to pose a risk of
future harm, radically unlike § 922(g)(1).

The American practice *after* the founding across the 19th century is the
same. Again, there were few complete bans, and none for felons. This period
carried over England's surety practice, *Bruen*, 142 S.Ct. at 2148, but class-wide
dispossession was commonly rejected. Following the Civil War, for example,
Congress refused to categorically dispossess southern rebels, in part due to
Second Amendment concerns. *See Whether the Second Amendment Secures an
Individual Right*, 28 Op. O.L.C. 126, 226 (2004). It did so at exactly the same

time it divested these same southerners of voting rights. First Supplementary Reconstruction Act of 1867, ch. 30, 15 Stat. 14 (1867).

Under *Bruen*, this lack of regulation across distinct eras is entitled to substantial weight. "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131. That is exactly the situation here. Crime, both violent and not, recidivism, public safety, and firearms possession are general societal problems and issues that have existed throughout history. Yet American society did not respond to these problems by barring felons from possessing guns for over one hundred and fifty years after the Founding. Blanket felon dispossession is a modern practice, not a historical one.

### C. THE THIRD CIRCUIT'S HOLDING THAT § 922(G)(1) IS UNCONSTITUTIONAL IN *RANGE* IS CORRECT.

This is the exact conclusion the Third Circuit reached in *Range*. There, the government and amici relied on 1938 and 1961 laws restricting firearm ownership, among others. The Third Circuit rejected these modern laws as analogues. It was "confident that a law passed in 1961—some 170 years after the Second Amendment's ratification and nearly a century after the Fourteenth Amendment's ratification—falls well short of 'longstanding' for

17

purposes of demarcating the scope of a constitutional right." 69 F.4th at 104. And it expressed extreme doubt about the relevance of the Federal Firearms Act of 1938, which only covered a narrow set of violent crimes and not the plaintiff's—"a dubious proposition given the *Bruen* Court's emphasis on Founding-and-Reconstruction era sources." *Id*.; *see also Bruen*, 142 S.Ct. at 2154 n.28 ("20th century evidence . . . does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence.").

Nor did the Third Circuit accept other, older "status-based" historical analogues proffered by the government that prohibited firearm ownership based on race and religion. These laws prohibited firearms possession by marginalized social groups, such as Loyalists, Native Americans, Quakers, Catholics, and Blacks." *Id*. at 105. Of course, the *Range* court noted, those restrictions would be flatly unconstitutional today, limiting their historical value. And the government was required to analogize those prohibited groups to the individual at issue (in that case, Mr. Range), but failed to show any such analogy to § 922(g)(1). *Id*. at 104-105.

Finally, the *Range* opinion rejected the government's argument that because the Founding-era practice was for every felony to be punishable by death, any other punishment is therefore constitutional. "The greater does not necessarily include the lesser," the Third Circuit reasoned, and if a person was not executed—and therefore remained covered by the Second Amendment—

18

the government provided no historical practice dispossessing that person any more than they could strip them of their freedom of speech. *Id.*; *see also Kanter*, 919 F.3d at 461–62 (Barrett, J., dissenting) ("we wouldn't say that the state can deprive felons of the right to free speech because felons lost that right via execution"). This absence is especially notable because while felonies were punishable by death, execution was in practice the minority form of punishment by the time of the Founding and accounted for less than a quarter of the sentences in felony convictions. Javier Bleichmar, *Deportation as Punishment: A Historical Analysis of the British Practice of Banishment and Its Impact on Modern Constitutional Law*, 14 Geo. Immgr. L.J. 115, 126 (1999) (citing A. Roger Ekirch, *Bound for America: The Transportation of British Convicts To The Colonies* 1718–1775, at 21 (1987)), *see also Kanter*, 919 F.3d at 461–62. In any event, the purpose of an execution was of course not to deprive one of his access to firearms. To the contrary, a felon could repurchase arms after his sentence. *Range*, 69 F.4th at 104. In short, the government failed to carry this burden as to Mr. Range, and must be held to that same strict burden for Mr. Serna.

The government will undoubtedly note in response that the majority opinion in *Range* included language stating that its opinion was a "narrow" one. *Id.* at 106. This is understandable given the nature of the question directly presented in the case before it. The historical tradition canvassed, however, is

equally applicable here in its total lack of support for Founding-era restrictions. Nothing in the body of the *Range* opinion relies on the nature of the prior conviction, and the en banc Court did not suggest how any of its reasoning or considerations might change with a different prior offense. This is for a simple reason: as there is insufficient support for any historical tradition of felon firearms dispossession *whatsoever*, the nature of the felony is naturally immaterial. The *Range* dissent recognized this, observing that "the analytical framework [the majority has] applied to reach their conclusion renders most, if not all, felon bans unconstitutional." 69 F.4th at 113 (Shwartz, J., dissenting).

This Court should apply that same analytical framework, and arrive at the same inevitable conclusion that, under the Supreme Court's "text and tradition" approach to the Second Amendment, Section 922(g)(1) is unconstitutional both facially and as applied to Mr. Serna

### D. THE EIGHTH CIRCUIT'S DECISION IN *UNITED STATES V. JACKSON* IS WRONG, AND DOES NOT CHART A DISTINCTLY SIMILAR HISTORICAL TRADITION.

Unlike *Range,* the Eighth Circuit came to the opposite conclusion in *United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023). In *Jackson*, the defendant was convicted at trial and raised his constitutional challenge on appeal, which the Eighth Circuit rejected. In doing so, the Court made two

errors. First, *Jackson* relied in significant part on the Third Circuit's withdrawn panel opinion in *Range*, which was withdrawn in favor of its en banc decision going the other way. And second, the Eighth Circuit made the very missteps that the en banc *Range* opinion, and then-Judge Barrett before it, had already charted the errors in, relying on a flawed set of status-based historical dispossessions to support the materially distinct felon in possession ban at issue here.

In upholding § 922(g)(1), the Eighth Circuit relied on the status-based firearms dispossession laws that stripped specific social groups, such as Catholics, Native Americans, or Loyalists, reasoning that these groups allowed for any group of people a legislature deems to be a threat to "orderly society" or "dangerous" to be prohibited from possessing a firearm. *Jackson*, 69 F.4th at 503–505. This, the Eighth Circuit reasoned, leaves it up to the legislatures to determine what groups of people may be relieved of their Second Amendment rights, and that someone convicted of a prior felony is sufficiently analogous to support the constitutionality of § 922(g)(1) after *Bruen*. *Id.* at 505.

In adopting this reasoning, however, the Eighth Circuit never confronted the problems with this status-based reasoning that have already been raised. It acknowledges the concern that virtually all of these prohibitions were the product of deep social discrimination and would be unconstitutional today. *Id.* at 503. But the Eighth Circuit never examined whether that historical

mismatch had any relevance to its strength as an analogy today. As the Fifth Circuit has rightfully observed, "[l]aws that disarmed slaves, Native Americans, and disloyal people may well have been targeted at groups excluded from the political community [and] written out of 'the people' altogether." *Rahimi*, 61 F.4th at 457. "Their utility as historical analogues is therefore dubious, at best." *Id.* This echoes the Supreme Court's recent skepticism of using historical discrimination as a foundation to uphold modern practice. *See Ramos v. Louisiana*, 140 S.Ct. 1390, 1394 (2020) (overruling precedent allowing nonunanimous jury verdicts in part due to their racist origins); *id.* at 1417–18 (Kavanaugh, J., concurring) ("the [discriminatory] origins and effects of the non-unanimous jury rule strongly support overruling *Apodaca*").

Further, the Eighth Circuit never reckons with the implication of these laws' existence alongside the total lack of an actual historical § 922(g)(1) analogue. To the extent any such disarmament laws were in effect by the Founding, the legislatures were aware of the concerns posed by possession of firearms by at least some groups at the time for some purposes, but felons were *never* categorically dispossessed—even as they were deprived of civic rights. *See, e.g., Kanter,* 919 F.3d at 457–58 (Barrett, J., dissenting) (charting the history of these dispossessions).

This is fatal to the analysis under *Bruen*. 142 S.Ct. at 2131. And, as the

*Range* court explained, the claim that § 922(g)(1) is constitutional because other minority social groups may have been regulated is simply "far too broad" to support the relevant historical analogy here. Just as the Supreme Court did not find that a historical tradition to regulate firearms in "sensitive places" allowed a legislature to simply designate any place a "sensitive" one and therefore regulate it, the fact that some groups were dispossessed at the founding does not mean that *any* group can be so dispossessed, for any reason. 69 F.4th at 105 (quoting *Bruen*, 142 S.Ct. at 2134). Just because some founding-era laws prohibited some forms of public carry, that did not mean that a law could "ban public carry altogether." *Bruen*, 142 S.Ct. at 2147. So too here: these pre-founding discriminatory exclusions carry no meaningful comparative weight to § 922(g)(1) as it was enacted and exists today.

## IV. IF THE COURT DOES NOT DISMISS THE CHARGES FACIALLY, THEY SHOULD BE DISMISSED AS-APPLIED WHERE HERE, THE FIREARM WAS UNLOADED

In *United States v. Griffin,* Judge Coleman of this district granted a motion to dismiss a § 922(g) count. 21-CR-693, Dkt. No. 85. The Court found that the dispossession of British loyalists is a proper historical analogue to § 922(g). *Id.* at 13. The Court went on to state that the British loyalist example requires an individualized assessment to determine whether an individual was

"untrustworthy" or "dangerous." *Id.* at 15. As such, the court finds that an as-applies analysis of § 922(g) is required. *Id.*

Despite prior convictions for robbery, criminal trespass, and possession of controlled substances, the court held that the defendant did not demonstrate a risk of violence and therefore granted the motion to dismiss. *Id.* at 16-17. The court in particular noted that the defendant was not arrested in the commission of a violent act and instead was smoking marijuana in an illegally parked car while in "mere possession" of a firearm. *Id.* at 16. Here, Mr. Serna was also not engaged in an act of violence. The reasoning of the *Griffin* decision is present here and in fact, bolstered by the fact that the firearm *was not loaded*. The defense submits that if the Court does not dismiss the charges facially, they should be dismissed as-applied.

## V. THE GOVERNMENT CANNOT SHOW "AN AMERICAN TRADITION" OF CRIMINALIZING GUN POSSESSION DURING ILLICIT CRIMINAL ACTIVITY.

The government also cannot meet its burden to establish a historical tradition similar to § 924(c)(1)(A)'s prohibition on possessing firearms in furtherance of drug sales. As in *Bruen*, the "general societal problem" that this part of § 924(c)(1)(A) addresses is not new. 142 S. Ct. at 2131. Arms possession in furtherance of illegal commercial activity—whether that be

24

smuggling, gambling, or selling banned substances like alcohol or drugs—
"has persisted since the 18th century.*" Id.*

Yet "there is little evidence of an early American practice" of
criminalizing weapon possession in furtherance of drug sales, or any other
"distinctly similar" illegal commercial activity. *See id.* at 2142 (articulating
standard). Instead, English law, founding-era law, and early and mid-
nineteenth century legislatures "addressed the societal problem . . . through
materially different means." *Id.* at 2131. Increased penalties for possession of
firearms in furtherance of crimes were "not widely found" in the United
States until the twentieth century. Robert J. Spitzer, *Gun Law History in the
United States and Second Amendment Rights*, 80 L. & Contemp. Problems
55, 80 (2017).

Indeed, the offense charged here is remarkably modern. Section 924(c)
was enacted in 1968, and it first prohibited using or carrying firearms for
drug trafficking in 1970. *United States v. Melville*, 309 F. Supp. 774, 776
(S.D.N.Y. 1970); *see also Gonzales v. Raich*, 545 U.S. 1, 10–15 (2005). It first
encompassed possession offenses in 1998. *See United States v. O'Brien*, 560
U.S. 218, 232–33 (2010). As with felon in possession laws, this is far too late
to alter the Second Amendment's meaning.

There is also little to indicate that English common law and the
Founding era criminalized weapon possession in furtherance of activities like

25

drug sales. *See, e.g.*, Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right*, 1–134 (1994); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 502–17 (2004) (each comprehensively reviewing gun regulations, and none mentioning such regulations or prohibitions). In a "vast newly compiled dataset of historical gun laws" in pre-Civil-War America, an academic found only one state and two territories that had *any* sentence enhancement for use of a gun during *any* crime, violent or nonviolent. Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & Contemp. Problems 55, 56, 60 (2017). Added penalties for use of guns now feels like an "old idea," but it was "not one widely found during the period under study," *i.e.*, between the 1600s and the very early 1900s. *Id.* at 80. Instead, in England and Founding-era America, lawmakers regulated commercial outlaws' arms possession in two fundamentally different ways.

First, English common law criminalized the public carry and use of common weapons by focusing not on crime generally, but on intent to cause fear or violence specifically. The common law criminalized publicly carrying firearms only when someone intended to carry the weapon for terror or violence. English common law historically prohibited only carrying a weapon with intent to "terrify the King's subjects." *Bruen*, 142 S. Ct. at 2141–42; *see,*

*e.g.*, Malcolm, *To Keep and Bear Arms* at 105 (discussing the Statute of Northampton).

Colonial America and the Founding era did nothing more than "codif[y] th[is] existing common-law offense of bearing arms to terrorize the people." *Bruen*, 2143. Then, in the early and mid-nineteenth century, the few American entities that criminalized possessing a dangerous weapon while committing another crime did so only for crimes widely considered violent. *See* Spitzer, *Gun Law History* at 80 ns. 172–75 (identifying enhancements for possessing a dangerous weapon during a robbery or burglary in Connecticut, territorial Ohio, and territorial Washington).

Second, England and Founding-era America addressed the social problem of weapons use during illegal activity by wholesale criminalization of *types* of weapons thought to be commonly used by dangerous people. *Heller*, 554 U.S. at 627; *Caetano v. Massachusetts*, 577 U.S. 411, 412 (2016) (*per curiam*). For example, in response to "acute disorder" from "bands of malefactors . . . committing assaults and murders" across England, the Statute of Northampton prohibited public carry of particular weapons and armor. *Bruen* at 2139–40. Those specific arms, "launcegays" and other lances, were "carried only when one intended to engage in lawful combat or . . . breach the peace," so banning them from public carry entirely was acceptable.

27

*Id.* at 2140. By contrast, daggers were used for self-defense by "almost everyone"—and so were not prohibited. *Id.*

Similarly, in the early and mid-nineteenth century, state legislatures did not criminalize possessing *any* weapon while engaging in commercial crimes (like illegally selling alcohol, running a gambling house, or engaging in prostitution). People engaging in those crimes, like felons, still had the right to possess common weapons for self-defense. *Id.* at 2142 n.12; Malcolm, *To Keep and Bear Arms* at 123 (concluding that Catholics maintained "a right to own arms for personal defense," even when England assumed that all Catholics were engaged in mass treason against the crown).

Instead, a few states and territories criminalized possession of certain types weapons thought to be used for "fighting," or those "favored by 'assassins' and 'ruffians.'" David B. Kopel *et al.*, *Knives and the Second Amendment*, 47 U. Mich. J. of L. Reform 167, 180, 186 (2013) (quoting *Aymette v. State*, 21 Tenn. (2 Hum.) 154 (1840)). For example, Bowie knives and "Arkansas toothpicks" were two prominently outlawed arms in the early-to mid-nineteenth century. *Id.* Other similar outlawed arms included "dirks, daggers, slungshots, sword-canes, [and] brass-knuckles." *Id.* at 188; *see also* Cornell & DeDino, *A Well Regulated Right* at 517 (noting that some states prohibited "the sale of particular classes of weapons" around this period). *Heller* recognized this historical tradition of banning certain weapons

28

associated with outlaws, *i.e.*, "weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." 554 U.S. at 625.

In sum, concerned about potential criminals with guns, both England and early America carefully navigated around their citizens' gun rights. In so doing, they criminalized both the carrying of weapons to terrify others and the possession of weapons that were not commonly used for self-defense. But neither adopted anything "distinctly similar" to § 924(c)(1)(A)'s prohibition on gun possession in furtherance of a drug crime. *Bruen*, 142 S. Ct. at 2131. As a result, the government cannot meet its burden with respect to Count Three of the indictment, and it should be dismissed.

## CONCLUSION

Mr. Serna is covered by the plain text of the Second Amendment. The historical record demonstrates that laws prohibiting felons from possessing arms did not appear until the 20th Century. At the time that the Second Amendment was ratified, there was not a single felon-in-possession law on the books. Nor was there even a firearms restriction tied to criminality more generally. In stripping Mr. Serna of his Second Amendment rights based purely on his prior conviction of a felony offense, § 922(g)(1) violates the historical tradition of the Second Amendment and is unconstitutional.

The historical record also demonstrates that contemporary laws

prohibiting the possession of firearms in furtherance of a drug crime are not "distinctly similar" to historical, well-defined restrictions from the time of ratification, or in the decades that followed. For these reasons, the Court should find that Section 922(g)(1) and Section 924(c)(1)(A) are unconstitutional as to Mr. Serna, and should grant his motion to dismiss.

Respectfully submitted,

FEDERAL DEFENDER PROGRAM
John F. Murphy
Executive Director

By: /s/ *Seema Ahmad*
Seema Ahmad
Attorney for Juan Serna

Seema Ahmad
FEDERAL DEFENDER PROGRAM
55 E. Monroe Street, Suite 2800
Chicago, Illinois 60603
(312) 621-8300

## CERTIFICATE OF SERVICE

The undersigned, <u>Seema Ahmad</u>, an attorney with the Federal Defender Program hereby certifies that in accordance with FED.R.CRIM. P. 49, FED. R. CIV. P5, LR5.5, and the General Order on Electronic Case Filing (ECF), the following document(s):

## JUAN SERNA'S MOTION TO DISMISS

was served pursuant to the district court's ECF system as to ECF filings, if any, and were sent by first-class mail/hand delivery on <u>February 2, 2024</u>, to counsel/parties that are non-ECF filers.


By:     <u>*/s/ Seema Ahmad*</u>
         SEEMA AHMAD
         FEDERAL DEFENDER PROGRAM
         55 E. Monroe St., Suite 2800
         Chicago, Illinois 60603
         (312) 621-8344

31